# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs April 8, 2014

## STATE OF TENNESSEE v. MICHAEL LYNN HORN

**Appeal from the Criminal Court for Putnam County**
**No. 10-0542     Leon C. Burns, Jr., Judge**

_____

**No. M2013-01469-CCA-R3-CD - Filed August 13, 2014**

_____

The Defendant, Michael Lynn Horn, was found guilty of attempted second-degree murder, reckless endangerment, and felony evading arrest. The trial court sentenced the Defendant to serve twenty years for the attempted second-degree murder conviction, four years for the felony evading arrest conviction, and eleven months and twenty-nine days for the reckless endangerment conviction, for a total effective sentence of twenty years in the Tennessee Department of Correction. The Defendant appeals asserting that: (1) the evidence is insufficient to support his convictions for attempted second degree murder and felony evading arrest; (2) his sentence is excessive; (3) the trial court improperly denied access to Tennessee Bureau of Investigation personnel records for the two victims; and (4) the trial court erred when it denied his motion to have a new attorney appointed for his appeal. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS, J., and JOE H. WALKER, III, SP. J., joined.

Jason F. Hicks, Cookeville, Tennessee, for the appellant, Michael Lynn Horn.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Randy York, District Attorney General; and Anthony Craighead, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

# I. Facts
## A. Procedural History

This case arises from a high speed chase that ensued following an attempt by Tennessee Bureau of Investigation ("TBI") agents to initiate a traffic stop of the Defendant and execute an arrest warrant. A Putnam County grand jury indicted the Defendant for attempted first degree premeditated murder (Count 1), felony reckless endangerment (Count 2), and felony evading arrest (Count 3). The trial on the charges began on December 11, 2011, after which the jury found the Defendant not guilty of Count 1, but was unable to reach a unanimous verdict as to the lesser-included offenses of attempted first degree premeditated murder. The trial court declared a mistrial to the lesser-included offenses of attempted first degree premeditated murder. As to the remaining charges, the jury found the Defendant guilty of the lesser-included offense of misdemeanor reckless endangerment in Count 2 and of felony evading arrest as charged in Count 3. On August 29, 2012, a second trial was held on the lesser-included offenses of Count 1, and a jury found the Defendant guilty of attempted second degree murder.

## B. December 11, 2011 Trial

During the 2011 trial the parties presented the following evidence: Billy Miller, a TBI agent, testified that, on June 4, 2010, he was assisting the Middle Tennessee District TBI agents in Putnam County. On that date, he was driving an unmarked black Ford Explorer ("Explorer"), with Agent Friel riding with him as he attempted to locate the Defendant. Agent Miller explained that he planned to serve the Defendant with a "failure to appear" capias and that he also needed to speak with the Defendant about another matter unrelated to the capias.

Agent Miller testified that he learned that the Defendant was going to be at his mother's house on Pippin Road in Putnam County. On his way there, he learned that the Defendant was instead at A-Non Recycling Center located on Highway 70 West. Agent Miller said that he first observed the Defendant at the intersection of Highway 70 and Thomas Lane. At the time, Agent Danny Espinosa and Agent Harold Eaton were driving in a car behind him. Upon seeing the Defendant, Agent Miller activated the blue lights in the Explorer, which were located above the rearview mirror, and pulled up to the Defendant's car. He said that, in addition to the blue lights above the rear view mirror, there were "wig-wags" in front of the high beams and on the sides of the Explorer as well as blue lights and "wig-wags" on the back of the Explorer, which were all activated.

Agent Miller testified that he placed the Explorer in park, and he and Agent Friel then

exited the vehicle announcing, "Police. Police. Stop. Police." Agent Miller said that this procedure of identifying oneself as an officer is "standard" for safety purposes because he did not normally wear a uniform. He explained that on this particular date he wore a collared shirt with a TBI insignia on the chest. Agent Miller said that, as he approached the Defendant's vehicle, he made eye contact with the Defendant when he was approximately twelve feet from him. He described the Defendant as looking directly at him, and he recalled that the Defendant's eyes grew "as big as saucer[s]." The Defendant put his car in reverse and accelerated, driving down Thomas Road for approximately four-tenths of a mile. Agent Miller said that Agent Eaton and Agent Espinosa became the lead vehicle pursuing the Defendant while he and Agent Friel returned to their vehicle and joined the pursuit with lights and the siren engaged.

Agent Miller testified that, after traveling down Thomas Road in reverse for four-tenths of a mile, the Defendant "whip[ped]" his vehicle into a graveled driveway. Agent Miller said that the Defendant did so at such a high rate of speed that the car came up on its side, so that Agent Miller could "actually see the under-carriage of the vehicle." Agent Miller suggested that a "big bush" to the side of the driveway might have been what prevented the vehicle from flipping over.

Agent Miller testified that Agents Eaton and Espinosa pulled their vehicle into position to try to block the Defendant, with Agent Miller close behind, stopping approximately two feet from the Defendant's vehicle. Agent Miller stated that he could see the Defendant seated in the driver's seat. The Defendant looked up and looked directly at Agent Miller as he appeared to be "working the gearshift." Agent Miller said he heard the engine "rev" up and shift from neutral to drive, and the Defendant drove off again. At the time, Agent Espinosa, wearing a police badge "on front of his chest," had exited his vehicle and was approaching the Defendant announcing, "Police. Stop. Police. Stop." Agent Miller said that Agent Espinosa was at "the driver's side bumper front of [the Defendant's] vehicle" when the Defendant accelerated "straight towards" Agent Espinosa. Agent Miller said that, "it looked to me like, that [Agent Espinosa] had just sort of, and I don't know that he actually touched the vehicle, but just sort of was able to push off the front of the vehicle to get away from the oncoming vehicle." Agent Espinosa then began firing his weapon at the Defendant's vehicle.

Agent Miller testified that the Defendant could have taken an alternate route and avoided Agent Espinosa "all together," but he drove directly toward him. He described the Defendant's route as follows, "[The Defendant] hits the ditch line. He doesn't hit the fence, he hits the ditch line, comes back through, comes back around this tree and back out on the road and continues down Thomas [Road]." Agent Miller pursued the Defendant down Thomas Road with the lights and siren still activated.

3

Agent Miller testified that the Defendant accelerated to between forty and forty-five miles an hour and then "slam[med]" on his brakes. Agent Miller said that, when a suspect engages in this type of behavior, typically, the suspect is attempting to draw the pursuing officers close before hitting the brakes causing the officer to rear-end the suspect and deploying the officer's airbags. Based upon this erratic driving, Agent Miller followed at a safe distance to allow for a "reactionary gap." The Defendant continued down Thomas Road and made a right-hand turn onto Pippin. The Defendant drove past his mother's trailer before making a left onto Anderson and driving on a gravel road back behind his mother's trailer. The Defendant drove through a field with tall grass, with agents still in pursuit, and parked next to his mother's trailer. He exited his vehicle with his hands in the air. Agent Friel exited his vehicle with a weapon drawn and placed the Defendant on the ground. It was at this time that the agents discovered that the Defendant had been shot in the elbow.

Agent Miller testified that, while they waited for EMS to respond, the Defendant's mother and brother exited the trailer. The Defendant said to his mother, "Don't worry about it, Mother, . . . they're just doing their job. . . . They had every right to shoot me. They're just doing their job." Agent Miller testified that the length of the pursuit from the initial stop to the Defendant's mother's trailer was a mile and two-tenths. Agent Miller confirmed his certainty that the Defendant saw both him and the activated blue lights.

On cross-examination, Agent Miller confirmed that he was wearing a TBI polo shirt with a TBI insignia on it. He said that the pursuit occurred at approximately 4:00 p.m. while it was still light outside. Agent Miller said that Agent Espinosa had his gun drawn when he was approaching the Defendant's vehicle and ordering him to stop. Agent Miller recalled that, at the end of Thomas Road before the Defendant made a right on to Pippin, the Defendant stopped at the stop sign and put his arm out the window. At this time Agent Miller could see blood on the Defendant's arm. He said that both his car window and the Defendant's car window were down. Agent Miller said his siren was engaged, and he was yelling out the window at the Defendant, "Stop."

Dan Friel, a TBI agent, testified that he was the passenger in the vehicle with Agent Miller during the pursuit of the Defendant. Agent Friel testified that they turned onto Thomas Lane where a U.S. Marshal, Patrick Storie, was in a vehicle ahead of the Defendant, who was driving a black Jeep Cherokee. Patrick Storie was stopped in front of the Jeep and Agent Miller pulled up to the door of the Jeep with the vehicle's blue lights activated. Agent Friel said that he exited the passenger side of the vehicle and "ran around the front of the [Defendant's] vehicle yelling, 'TBI. Police. TBI. Police.'" Agent Friel explained that, because it was a Friday, he was dressed more casually in jeans but that he was still wearing his TBI badge. He said that Agent Miller exited the vehicle while also announcing a police presence. Agent Friel said that he made eye contact with the Defendant as he approached his

4

vehicle. He described the Defendant as "quite stunned that the police were there to try to talk to him." The Defendant put his vehicle in reverse and drove down Thomas Road "the opposite way." Agent Friel said it was "just amazing how fast the vehicle was traveling backwards."

Agent Friel testified that, while he and Agent Miller returned to their vehicle, Agent Eaton and Agent Espinosa, who had been following, assumed the lead in the pursuit of the Defendant. At this point, Agent Miller activated his siren in addition to the blue lights. Approximately a half a mile down the road, the Defendant either "lost control of the vehicle, or he was attempting to turn the vehicle around" when he "whipped" the car into a driveway. As he did so, the Defendant's Jeep "came up on its side," with two of the car wheels leaving the ground. Agent Eaton skidded in front of the Defendant's vehicle in an attempt to "block him in." Agent Friel said that he observed Agent Espinosa standing on Thomas Road with his firearm drawn when the Defendant drove toward Agent Espinosa. The Defendant drove across Thomas Road, hit a fence post, drove back on to Thomas Road, fish-tailed before going around a big oak tree in a residential yard, and then returned onto Thomas Road.

Agent Friel said that he and Agent Miller took the lead in the pursuit at this point. He described the Defendant as repeatedly accelerating his vehicle and then braking. To avoid a collision, Agent Miller kept a safe distance. Agent Friel said that, had they hit the Defendant, the air bags would have deployed, preventing the agents from any further pursuit. At the end of Thomas Road, the Defendant turned right on Pippin Road and then turned left to drive back behind a set of trailers. The Defendant drove through a field before coming to a stop in front of his mother's trailer.

Agent Friel testified that he exited his vehicle and took the Defendant into custody. He noticed that the Defendant was bleeding, so he requested an ambulance. The Defendant stated to Agent Friel that he had been shot.

Harold Eaton, a TBI agent, testified about his involvement with the apprehension of the Defendant on June 4, 2010, in Putnam County, Tennessee. He said that he drove a white Durango and that Agent Espinosa rode in the car with him. He said that he first encountered the Defendant on Thomas Road. He explained that Agent Miller and Agent Friel were "the lead car" directly behind the Defendant. Behind Agent Miller's vehicle was a "citizen vehicle," and then the vehicle with him and Agent Espinosa inside. Agent Eaton said by the time he had turned onto Thomas Road, Agent Miller and Agent Friel were already out of their vehicle and approaching a black Jeep Cherokee. He recalled that both agents were yelling, "Police" when the Defendant began driving in reverse down Thomas Road. Because Agent Miller and Agent Friel were outside of their vehicle, Agent Eaton assumed the pursuit of the Defendant at what he described as "a high rapid speed." He did not ever confirm his

speed on his speedometer but estimated speeds in excess of fifty or sixty miles an hour and described the Defendant's driving as "very erratic."

Agent Eaton testified that he did not activate his blue lights because the hand-held device that initiated the vehicle's lights fell by his feet where he was unable to reach it. Agent Eaton explained that, in light of two officers outside of their car and a suspect driving in reverse down a public road at high speed, activating his lights was "the least of my worries at that point." Approximately a half mile down the road, the Defendant's vehicle hit some gravel and slid into a driveway. He said the Jeep rocked on its carriage like it was going to flip over, but a "big bush" on the side of the driveway prevented the vehicle from flipping. Agent Eaton tried to pull across the driveway to prevent the Defendant from re-entering the roadway but, due to his speed, slid slightly past the Defendant's vehicle. Agent Espinosa exited the vehicle, and as Agent Eaton exited the vehicle he observed the Defendant manipulating the gearshift and then the Jeep moved forward. Agent Eaton said he heard gunshots, but he was unaware of Agent Espinosa's location at the time because he was watching the Defendant. He said that the Defendant drove the Jeep across Thomas Road, corrected, and drove back over Thomas Road before finally "righting itself" and continuing northbound on Thomas Road. Agent Eaton acknowledged that both he and Agent Espinosa were wearing plain clothes on this day, but he said both agents wore visible TBI badges.

Agent Eaton testified that Agent Espinosa got back into the vehicle and stated, "He tried to run me over." Agent Eaton again joined the pursuit of the Defendant. He said that they caught up with the Defendant toward the end of Thomas Road. He observed the Defendant employing his brakes in a manner that led Agent Eaton to believe the Defendant was attempting to cause Agent Miller to rear-end the Defendant's Jeep. The Defendant turned right onto Pippin Road and then made a left to loop around to the back of the trailers that fronted Pippin Road. The Defendant drove through a field and parked his Jeep next to his mother's trailer.

Agent Espinosa testified about his involvement in the pursuit of the Defendant on June 4, 2010. On that day, he wore a white t-shirt and baseball cap. He explained that around his neck he wore a chain with his TBI badge on it. Agent Espinosa said that he frequently worked undercover and generally wore "regular clothes" to work. Agent Espinosa said that he had worked in law enforcement since 1993 and this was the first occasion that he had fired his weapon.

Agent Espinosa testified that he and Agent Eaton were traveling down Highway 70 en route to the Defendant's mother's residence. Through a radio dispatch, he learned that the Defendant was not at his mother's residence but on Thomas Road. At this time, he and Agent Eaton were nearing the intersection of Highway 70 and Thomas Road. Agent Miller

was driving a vehicle ahead of them. As Agent Eaton made the turn onto Thomas Road, Agent Espinosa observed Agent Miller, with the blue lights activated, pull up to a black Jeep Cherokee. Agent Espinosa said that he could see the Defendant and the look on his face during this incident. He stated, "I could see him, and I could see in his face that he wasn't going to stop." The Defendant then proceeded to drive the Jeep in reverse down Thomas Road at a high rate of speed. Agent Espinosa estimated their speed in pursuit of the Defendant as at least fifty miles per hour. He described Thomas Road as "very curvy" and "very hilly," causing concern about the safety of other drivers on the road since the Defendant was "all over the road."

Agent Espinosa testified that about a half mile down the road the Defendant backed into a driveway, and the Jeep tipped up. Agent Eaton's vehicle slid in the driveway near the Defendant in an attempt to block the Defendant from re-entering the road. Agent Espinosa said that he jumped out of the passenger side of the vehicle and ran around the rear quarter panel of the Jeep with a drawn weapon and to identify himself, yelling, "Police, [p]olice. Stop. Police." Agent Espinosa said that he was standing close enough to the Defendant to see his face and know that the Defendant was looking directly at Agent Espinosa. Based upon the Defendant's facial expression, Agent Espinosa did not believe the Defendant intended to stop. He watched the Defendant fumble with the gear shift, get the car in gear, and then he heard the engine roar. He recalled, "I very distinctly remember that, the sound of that motor, revving up, revving up, and when it caught, I thought, 'Wow, he's got me. He's going to hit me.'" Agent Espinosa said that, following his training, he quickly moved "off line of the vehicle," and, as he was moving, he fired his weapon.

Agent Espinosa testified that he could not estimate how close the vehicle came to striking him because the vehicle was so close that he could not tell whether he actually touched the vehicle or not. After he fired his weapon, he saw the Defendant fall over in his seat and then pop back up. The Defendant crossed over Thomas Road, clipped a pole, and then went back across Thomas Road and drove around a big tree before driving the Jeep back onto Thomas Road. At this time, Agent Miller and Agent Friel pursued the Defendant's vehicle.

Agent Espinosa testified that after the Defendant had come to a stop by his mother's trailer, Agent Espinosa exited his car and approached the Defendant. Agent Espinosa said that he was upset and "shaken" at the time, and that he asked the Defendant, "Why did you try to run me over?" The Defendant responded, "I'm sorry. I shouldn't have tried to run you over."

After hearing this evidence, the jury returned a verdict of not guilty as to Count 1, however, the jury remained dead-locked as to the lesser-included offenses of attempted first

7

degree premeditated murder in Count 1. The jury found the Defendant guilty of the lesser-included offense of misdemeanor reckless endangerment in Count 2 and felony evading arrest in Count 3.

## B. August 29, 2012 Trial

A second trial was held on the lesser-included offenses of Count 1. The evidence presented at the second trial was substantially the same as the evidence at the first trial. Based upon this evidence, the jury convicted the Defendant of attempt to commit second degree murder. A sentencing hearing was held on all of the Defendant's convictions on October 3, 2012, and the trial court signed the judgments of conviction on October 5, 2012. The trial court sentenced the Defendant to serve concurrent sentences of twenty years for the attempt to commit second degree murder conviction, eleven months and twenty-nine days for the misdemeanor reckless endangerment conviction, and four years for the felony evading arrest conviction. The Defendant filed his motion for new trial on April 29, 2013.

## II. Analysis

The Defendant raises four issues on appeal: (1) the evidence is insufficient to support his convictions for attempted second degree murder and felony evading arrest; (2) his sentence is excessive; (3) the trial court improperly denied access to TBI personnel records for the "two alleged victims;" and (4) the trial court erred when it denied his motion to have a new attorney appointed for his appeal. The State responds that, because the Defendant failed to file a timely motion for new trial, he has waived all issues except sufficiency of the evidence and sentencing. As to his two remaining issues, the State asks us to affirm the Defendant's convictions and sentence.

## A. Motion for New Trial

A motion for new trial "shall be made . . . within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). The time for filing a motion for new trial is mandatory and may not be extended. Tenn. R. Crim. P. 45(b); *State v. Johnson*, 980 S.W.2d 414, 418 (Tenn. Crim. App. 1998). "The thirty (30) day provision is jurisdictional, and an untimely motion is a nullity." *State v. Johnson*, 980 S.W.2d at 418. The Defendant's order of sentence was entered on October 5, 2012. His motion for new trial was not filed until April 29, 2013, significantly more than thirty days later. Thus, we agree with the State that the Defendant has waived his right to appeal any of the issues he raised in his motion for new trial other than sufficiency of the evidence and sentencing. *See State v. Patterson*, 966 S.W.2d 435, 440 (Tenn. Crim. App.1997).

8

We now turn to address whether the evidence is sufficient to sustain the Defendant's convictions and whether the trial court erred when it sentenced him. .

## B. Sufficiency of the Evidence

The Defendant asserts that there is insufficient evidence to support his convictions for attempt to commit second degree murder and felony evading arrest. He contends that the State failed to show that he had the intent to murder Agent Espinosa, an essential element of the attempt to commit second degree murder charge, and that the proof was insufficient to establish that he knew the TBI agents were law enforcement officers, as required to prove felony evading arrest. The State responds that there was sufficient evidence presented at trial to support both convictions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses

for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

### 1. Attempt to Commit Second Degree Murder

The Defendant challenges this conviction asserting that the State failed to show that he had the intent to murder Agent Espinosa. The State responds that evidence was more than sufficient for a reasonable trier of fact to find the Defendant guilty beyond a reasonable doubt of attempted second degree murder.

"Second degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210. "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or . . . acts with the intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense" T.C.A. § 39-12-101(a)(2)-(3)(2010).

10

The evidence, viewed in the light most favorable to the State, proves that the Defendant fled from officers attempting to serve a capias for his arrest. During his flight, which occurred during daylight hours, the Defendant drove in reverse down a hilly road at a high rate of speed before sliding into a gravel driveway, where agents attempted to block his vehicle from returning to the road. Agent Espinosa, wearing a TBI badge around his neck and announcing that he was "police," walked directly toward the Defendant, making eye contact. The Defendant put his vehicle in gear and accelerated directly toward Agent Espinosa, who was nearly struck by the Defendant's vehicle. After the Defendant was apprehended, Agent Espinosa asked the Defendant why he tried to run over him and the Defendant responded, "I'm sorry. I shouldn't have tried to run you over." This evidence is sufficient to support the jury's finding that the Defendant attempted to run over Agent Espinosa during his flight from law enforcement. A rational jury could conclude beyond a reasonable doubt that running over Agent Espinosa under these circumstances would have been reasonably certain to cause Agent Espinosa's death.

Accordingly, we conclude that the evidence is sufficient to support the Defendant's conviction for attempt to commit second degree murder. The Defendant is not entitled to relief.

## 2. Felony Evading Arrest

The Defendant asserts that the State did not prove the essential elements of felony evading arrest because the State failed to show that the Defendant knew that his pursuers were law enforcement agents. In support of this contention, the Defendant points out that the men pursuing the Defendnat were wearing plain clothes and driving unmarked vehicles. The State responds that the evidence is sufficient to sustain the Defendant's conviction for felony evading arrest. We agree with the State.

Tennessee Code Annotated section 39-16-603 provides that "[i]t is unlawful for any person, while operating a motor vehicle on any street, road, alley, or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to bring the vehicle to a stop."

The evidence, considered in the light most favorable to the State, showed that TBI agents in unmarked vehicles, with emergency lights activated, approached the Defendant's car. The agents were wearing visible TBI badges and announced to the Defendant that they were law enforcement officers. The Defendant made eye contact with the officers before fleeing with his car in reverse. Agent Miller then activated his vehicle's siren in addition to the emergency lights and once again pursued the Defendant. Agent Espinosa, wearing his TBI badge, approached the Defendant's car with a weapon drawn announcing that he was

11

law enforcement. Again, the Defendant fled from the officers. Upon his apprehension outside his mother's trailer, the Defendant acknowledged that the agents were "doing their job." This evidence supports the jury's conclusion that the Defendant fled in his vehicle from the TBI agents after the agents had signaled for the Defendant to stop his vehicle.

Accordingly, we conclude that the evidence is sufficient to sustain the Defendant's conviction for felony evading arrest, an E felony. The Defendant is not entitled to relief.

## B. Sentencing

The Defendant challenges the trial court's weighing of the mitigating factors by asserting that the trial court did "not put enough emphasis on the Defendant's mitigating factors." The State responds that the trial court acted within its discretion when it sentenced the Defendant to serve twenty years. We agree with the State.

In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). A finding of abuse of discretion " 'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*. at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id*. at 707. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative

12

office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2010); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2010).

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c) (2012).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. *See* T.C.A. § 40-35-114 (2012); *see also Bise*, 380 S.W.3d at 699 n. 33, 704. Specific to the review of the trial court's finding enhancement and mitigating factors, "the 2005 amendments deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors." *State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Id.* at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate Courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

The Defendant does not challenge that he is a Range II, multiple offender, convicted of a Class B felony. *See* T.C.A. § 39-13-210 (2010). As such, his applicable sentencing range for the attempted second degree murder conviction was twelve to twenty years. *See*

13

T.C.A. § 40-35-112(b)(2) (2012).

In this case, at the close of the sentencing hearing, the trial court found the following enhancement factors applied:

(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;
        . . . .

(8) The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community;

(9) The defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense;

(10) The defendant had no hesitation about committing a crime when the risk to human life was high;


        . . . .

(13) At the time the felony was committed, [the Defendant was on pretrial release]

T.C.A. § 40-35-114(1), (8), (9), (10) & (13) (2012).

The trial court considered each of the statutory mitigating factors including those submitted by the Defendant under the "catch-all" provision of mitigating circumstance of Tennessee Code Annotated section 40-35-113(13): (1) the officers were acting in a way that "it was no[t] obvious to the average person that they were law enforcement officers;" (2) the Defendant expressed his remorse to the officers involved; and (3) the Defendant had been involved with a jail ministry counseling young men. The trial court stated that based upon the circumstances surrounded the arrest, he believed the Defendant knew he was being confronted by law enforcement and intentionally fled in a dangerous manner. The trial court stated that it did not find any of the mitigating factors or circumstances applicable based on the facts of this case.

On appeal, the Defendant does not contest the trial court's application of enhancement and mitigating factors. Instead he contests its weighing of those factors, arguing that, because the trial court "mainly bases its decision on the fact that he clearly tried to evade and his long criminal past." Under our sentencing law, however, the Defendant may not properly

14

appeal the trial court's weighing of enhancement and mitigating factors. *See Carter*, 254 S.W.3d at 344. The Defendant's twenty-year sentence was within the applicable range for the Defendant. Because the trial court based the twenty-year sentence on a thorough weighing of the applicable enhancement and mitigating factors, it sentenced the Defendant in a manner consistent with the purposes and principles of the Sentencing Act. *Id*. at 346. As such, we will not disturb his sentence on appeal. The Defendant is not entitled to relief on this issue.

## III. Conclusion

After a thorough review of the record and applicable law, we conclude the evidence was sufficient to support the Defendant's convictions for attempt to commit second degree murder and felony evading arrest, and the trial court properly sentenced him to twenty years, to be served in the Tennessee Department of Correction. As such, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE